No. 25-10234

---

UNITED STATES COURT OF APPEALS FOR THE
FIFTH CIRCUIT

---

UNITED STATES OF AMERICA,

Plaintiff – Appellee

v.

DAVID M. YOUNG,

Defendant – Appellant

---

On Appeal from the United States District Court,
Northern District of Texas, 3:21-CR-0417,
Honorable Brantley Starr, Presiding

---

BRIEF FOR APPELLANT

---

S. MICHAEL MCCOLLOCH, PLLC
**S. Michael McColloch**
E-mail: smm@mccolloch-law.com
Phone: 214.643.6055
6060 N. Central Expressway, Suite 500
Dallas, Texas 75206

LAW OFFICE OF STEPHEN CHAHN LEE, LLC
**Stephen Chahn Lee**
Email: SLee@StephenLeeLaw.com
Phone: 312.436.1790
209 S. LaSalle Street, Suite 950
Chicago, IL 60604

KAREN COOK, PLLC
**Karen L. Cook**
E-mail: karen@karencooklaw.com
Phone: 214.643.6054
6060 N. Central Expressway, Suite 500
Dallas, Texas 75206

**Attorneys for Appellant**

## CERTIFICATE OF INTERESTED PERSONS

No. 25-10234

DAVID M. YOUNG,
Defendant – Appellant

v.

UNITED STATES OF AMERICA,
Plaintiff – Appellee

The undersigned counsel of record certifies that the following listed persons and entities, as described in the fourth sentence of Rule 28.2.1, have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

| | |
|---|---|
| District Judge: | Honorable Judge Brantley Starr |
| Appellant: | David M. Young |
| Counsel for Appellant: | S. Michael McColloch<br>Karen L. Cook<br>Stephen C. Lee<br>Michael Clark (Trial) |
| Acting United States Attorney for The Northern District of Texas: | Nancy Larson |
| Assistant U.S. Attorney for The Northern District of Texas: | Brynn Shiess (Trial)<br>Ethan Womble (Trial)<br>Stephen Gilstrap (Appeal)<br>Jeremy Sanders (Appeal) |

*/s/ Karen Cook*
Karen Cook
Attorney of Record for Appellants

### STATEMENT REGARDING ORAL ARGUMENT

This case presents the Court with significant and recurring issues in health care fraud prosecutions involving evidentiary sufficiency defects regarding knowledge, willfulness, agreement and venue.  This case also raises issues concerning the use of unrelated third-party witnesses to establish the defendant's culpable mental state, the need for jury instructions on multiple conspiracies when only one conspiracy is alleged, and the standard for assessment of "pecuniary harm" in calculating losses in applying the Sentencing Guidelines.

Appellant respectfully requests oral argument.  Each of these issues requires a comprehensive review of the evidence and its application to Supreme Court and Fifth Circuit precedents.  The resolution of each of these issues is largely fact-specific, even if the questions raised here commonly confront the district courts in conspiracy and health care fraud cases.  The relevant facts were adduced over the course of a two-week jury trial involving some 23 witnesses and hundreds of pages of exhibits.  The Court's treatment of each of these challenges will benefit significantly from the probing and dialogue which oral argument can uniquely provide.

TABLE OF CONTENTS

**Page**

Certificate of Interested Persons ................................................................. i

Statement Regarding Oral Argument ....................................................... ii

Table of Contents ...................................................................................... iii

Table of Authorities ................................................................................... v

Jurisdictional Statement ............................................................................ 1

Statement of Issues Presented for Review ................................................ 2

Statement of the Case ................................................................................ 3

Statement of Facts ...................................................................................... 6

Summary of the Argument ....................................................................... 17

Argument and Authorities ....................................................................... 19

I.    The Evidence was Constitutionally Insufficient ............................ 19

      A.    Standard of Review ............................................................... 19

      B.    Elements ................................................................................. 20

            1.    Conspiracy to Commit Health Care Fraud (Count I) .............. 21

            2.    False Statement Charges (Counts II through IV) .................... 30

II.   The Evidence Was Constitutionally Insufficient to Prove Venue
      and Vicinage ........................................................................................ 33

      A.    Conspiracy to Commit Health Care Fraud ........................... 36

      B.    False-Statement Counts ........................................................ 39

## TABLE OF CONTENTS, CONT'D

**Page**

III.   A New Trial Should Be Ordered Because the District Court
       Admitted Irrelevant Opinions about Others' Knowledge ........................... 41

IV.    A New Trial Should Be Ordered Because of Failure to Give
       Instruction Regarding Multiple Conspiracies................................................ 45

V.     The Sentence Should Be Vacated Because the District Court
       Erred in its Calculation of the Loss Amount ................................................ 50

       A.    Standard of Review ............................................................................ 50

       B.    Intended Loss ..................................................................................... 51

       C.    The Loss Calculation Was Improper................................................... 53

Conclusion ............................................................................................................. 55

Certificate of Service ............................................................................................. 57

Certificate of Compliance....................................................................................... 57

## TABLE OF AUTHORITIES

**Cases**                                                                     **Page**

*Blumenthal v. United States*, 332 U.S. 539 (1947) ................................ 47

*De Rosier v. United States*, 218 F.2d 420 (5th Cir. 1955)............................... 36, 40

*Diaz v. United States*, 602 U.S. 526 (2024)............................................ 43

*Holmes v. South Carolina*, 547 U.S. 319 (2006) ..................................... 45

*Jackson v. Virginia,* 443 U.S. 307 (1979)............................................ 19-20

*Kotteakos v. United States*, 328 U.S. 750 (1946)...................................... 46-48

*Molina-Martinez v. United States*, 578 U.S. 189 (2016) .................................. 50-51

*Smith v. United States*, 599 U.S. 236 (2023)......................................... 38-39

*Tibbs v. Florida*, 457 U.S. 31 (1982)............................................... 30

*United States v. Abdelaziz*, 68 F.4th 1 (1st Cir. 2023)................................ 46-47

*United States v. Brown*, 354 F. App'x 216 (5th Cir. 2009) ................................... 28

*United States v. Cabrales,* 524 U.S. 1 (1998).................................... 34-35

*United States v. Clenney*, 434 F.3d 780 (5th Cir. 2005)........................... 37

*United States v. Crawley*, 381 F. App'x 462 (5th Cir. 2010) ..................... 29

*United States v. Davis*, 132 F.3d 1092 (5th Cir. 1998)............................ 21

*United States v. Elam*, 678 F.2d 1234 (5th Cir. 1982)............................ 48

*United States v. Ezukanma*, 756 F. App'x 360 (5th Cir. 2018) ............................ 27

*United States v. Fortenberry,* 89 F.4th 702 (9th Cir. 2023) ..................... 40

*United States v. Ganji*, 880 F.3d 760 (5th Cir. 2018).............2, 17, 19, 21-25, 29-32

*United States v. Hamilton*, 37 F.4th 246 (5th Cir. 2022)................................... 20-21

### TABLE OF AUTHORITIES, CONT'D

**Cases**                                                              **Page**

*United States v. Harrison*, 942 F.2d 751 (10th Cir. 1991) ...................................... 48

*United States v. Heard*, 709 F.3d 413 (5th Cir. 2013) ........................................... 42

*United States v. Isiwele*, 653 F.3d 196 (5th Cir. 2011) .......................................... 53

*United States v. Lee*, 966 F.3d 310 (5th Cir. 2020),
    *cert. denied*, 141 S. Ct. 639 (2020) ............................................................. 36

*United States v. Little*, No. 21-11225, 2023 WL 7294199
    (5th Cir. 2023) ....................................................................................... 27

*United States v. Martinez*, 921 F.3d 452 (5th Cir. 2019) ...................................... 28

*United States v. Mitchell*, 484 F.3d 762 (5th Cir. 2007) ....................................... 20

*United States v. Niamatali*, 712 F. App'x 417 (5th Cir. 2018) .............................. 38

*United States v. Nora*, 988 F.3d 823 (5th Cir. 2021) ........................................... 21

*United States v. Ramirez*, 420 F.3d 134 (2d Cir. 2005) ........................................ 38

*United States v. Ramos–Cardenas,* 524 F.3d 600 (5th Cir. 2008) ......................... 20

*United States v. Rao*, 123 F.4th 270 (5th Cir. 2024) ............................................ 52

*United States v. Read*, 710 F.3d 219 (5th Cir. 2012) ............................................ 28

*United States v. Robinette*, 832 F. App'x 261 (5th Cir. 2020) ............................... 27

*United States v. Rodriguez-Lopez*, 756 F.3d 422 (5th Cir. 2014) .......................... 36

*United States v. Rodriguez-Moreno*, 526 U.S. 275 (1999) ............................... 34-35

*United States v. Romans*, 823 F.3d 299 (5th Cir. 2016) ................................... 33-34

*United States v. Rosnow,* 977 F.2d 399 (8th Cir. 1992) ......................................... 48

*United States v. Ruppel*, 666 F.2d 261 (5th Cir. 1982) .......................................... 42

## Table of Authorities, cont'd

**Cases**                                                                                                           **Page**

*United States v. Salinas*, 373 F.3d 161 (1st Cir. 2004)............................................. 40

*United States v. Sanders*, 952 F.3d 263 (5th Cir. 2020) ......................................... 26

*United States v. Simmons*, 714 F.2d 29 (5th Cir. 1983)........................................... 30

*United States v. Smith,* 22 F.4th 1236 (5th Cir. 2022)............................................. 37

*United States v. Stowell*, 947 F.2d 1251 (5th Cir. 1991) ......................................... 50

*United States v. Strain,* 396 F.3d 689 (5th Cir. 2005) .......................................37-38

*United States v. Swafford*, 512 F.3d 833 (6th Cir. 2008).......................................... 48

*United States v. Tarango*, 396 F.3d 666 (5th Cir. 2005) ......................................... 30

*United States v. Ubak-Offiong*, 364 F. App'x 859 (5th Cir. 2010)......................... 35

*United States v. Valdez*, 726 F.3d 684 (5th Cir. 2013) ............................................ 53

*United States v. Vargas*, 74 F.4th 673 (5th Cir. 2023) ............................................ 52

*United States v. Willett*, 751 F.3d 335 (5th Cir. 2014) ............................................ 26


**Constitutional Provisions**

U.S. Const. art. III, § 2, cl. 3 ................................................................. 33

U.S. Const. amend. VI........................................................................... 33


**Statutes**

18 U.S.C. § 1001...................................................................................... 39

18 U.S.C. § 1035........................................................................... 3, 39, 41

TABLE OF AUTHORITIES, CONT'D

**Statutes**                                                                    **Page**

18 U.S.C. § 1347 ................................................................................ 20, 35

18 U.S.C. § 1349 ...................................................................................... 3

18 U.S.C. § 3231 ...................................................................................... 1

18 U.S.C. § 3237 .................................................................................... 39

28 U.S.C. § 1291 ...................................................................................... 1

The Ryan Haight Online Pharmacy Consumer Protection Act of 2008, Pub.
    L. No. 110-425, 122 Stat. 4820-34 (2008) .................................... 11


**Rules**

Fed. R. Crim. P. 18 ................................................................................. 34

Fed. R. Crim. P. 29 ................................................................................. 30

Fed R. Crim. P. 33 ................................................................................. 30

Fed. R. Ev. 403 ................................................................................. 18, 45


**Other Authorities**

Steven A. Engel, *The Public's Vicinage Right: A Constitutional Argument,*
    75 N.Y.U. L. REV. 1658 (2000) ...................................................... 34

## JURISDICTIONAL STATEMENT

The district court had subject matter jurisdiction pursuant to 18 U.S.C. § 3231. The appeal is from a judgment of conviction that disposed of all counts. Dr. Young's motions for new trial and judgment of acquittal were denied on September 5, 2023. ROA.1399-1431, 1432-64, 1521-27. The district court entered the judgment and an amended judgment on January 16, 2024. ROA.1586-92, 1593-99. The notice of appeal was timely filed on January 24, 2025. ROA.1600-01. This Court has jurisdiction pursuant to 28 U.S.C. § 1291.

## STATEMENT OF ISSUES PRESENTED FOR REVIEW

1.      The evidence on each count was insufficient under the standard established by this Court in *United States v. Ganji*, 880 F.3d 760 (5th Cir. 2018).

2.      The evidence on each count was insufficient to prove venue in the Northern District of Texas as alleged in the superseding indictment because there was no evidence introduced at trial that Dr. Young formed an agreement in the Northern District of Texas, performed an overt act there, or made a false statement there.

3.      The District Court reversibly erred in admitting evidence of other physicians' opinions about the legality of their conduct when they had no interaction with Dr. Young and had different experiences from Dr. Young.

4.      The District Court reversibly erred in refusing to give a jury instruction about multiple conspiracies given the lack of connections between the three companies that were a focus of the government's case in chief.

5.      The District Court reversibly erred in using the amounts billed by DME companies and genetic testing labs as a proxy for the amount of "pecuniary harm" that Dr. Young "purposely sought to inflict" when there was no evidence that Dr. Young knew the amounts that were billed, had no way of knowing, and had no involvement in determining those amounts.

## STATEMENT OF THE CASE

**Procedural History and Disposition Below**

On September 8, 2021, a grand jury returned an indictment against Dr. David Young alleging one count of conspiracy to commit health care fraud and three counts of false statements.  ROA.31.

Count I alleged that Dr. Young had conspired with Steven Kahn, Matthew Harrington, Miranda Harrington, Michael Speer, and "other persons known and unknown" "in the Dallas Division of the Northern District of Texas, and elsewhere" to commit health care fraud, in violation of 18, U.S.C. §1349.  ROA.41.

Counts II through IV alleged that Dr. Young had made false statements regarding three specific patients in violation of 18 U.S,C. §§ 1035(a) and 2 on specific dates in February 2019 "in the Dallas Division of the Northern District of Texas, and elsewhere."  ROA.42-43.

On June 21, 2023, a grand jury returned a superseding indictment against Dr. Young.  ROA.492.  Count I named Clifford Powell and Christian Arendt as two additional people whom Dr. Young had allegedly agreed with "in the Dallas Division of the Northern District of Texas, and elsewhere" to commit health care fraud. ROA.502-03.  Count II alleged a false statement in February 2019 involving a different patient than the second count in the original indictment.  ROA.503-04.  As before, Count II alleged that Dr. Young made a false statement with regards to that

patient "in the Dallas Division of the Northern District of Texas, and elsewhere." ROA.503.

Trial began on May 14, 2024. The government called multiple witnesses, including two alleged co-conspirators: Steven Richardson, who ran a company associated with braces (Expansion Media Telemed Group), and Clifford Powell, who ran a company associated with genetic tests (Momentum). ROA.3012 (Richardson); ROA.3175 (Powell). The government also called Pamela Edwin, who worked for another company associated with braces (Sunrise Medical). ROA.2335.

The government called two doctors who were connected to Sunrise Medical (the company associated with alleged co-conspirators Steven Kahn and Pamela Edwin) but had never interacted with Dr. Young. One doctor had pled guilty in Louisiana, Dr. Shannon Haas. ROA.2897-99, 2993-94. Another doctor, Dr. Matthew Craig, had interacted briefly with Sunrise Medical in 2017 before attempting to report the company to law enforcement. ROA.2608, 2626, 2633, 2656.

At the close of the government's case, Dr. Young moved for acquittal under Rule 29. ROA.3834-40. The district court denied the motion without explanation. ROA.3844.

During the defense case, Dr. Young testified. ROA.3999. He also called two of the alleged co-conspirators – Matthew Harrington and Steven Kahn. ROA.3852 (Harrington); ROA.3961 (Kahn).

On May 24, 2024, the jury returned a verdict of guilty on all four counts. ROA.4657-58.

On July 1, 2024, Dr. Young filed a motion for acquittal. ROA.1432-64. He also filed a motion for a new trial. ROA.1399-431. The government filed its consolidated response to both motions on August 7, 2024. ROA.1479-514. The district court denied the motions on September 5, 2024 without a hearing. ROA.1521-27.

In the Presentence Investigation Report, Probation found that Dr. Young was "responsible for an intended loss" of $71,732,452.41, based on the total amounts billed to Medicare for orthotics/DME and for genetic tests. ROA.5218, 5223. Dr. Young filed objections to this loss calculation. ROA.5239-58, 5287-5291. The district court denied Dr. Young's objections and found that Dr. Young was accountable for the full amount found by Probation. ROA.1593-99, 4775, 5292-95.

On January 16, 2025, the district court sentenced Dr. Young to 120 months' imprisonment on Count I and 60 months' imprisonment on Counts I through IV, with all sentences to run concurrently. ROA.1593-99. The district court also imposed a restitution award of $26,622,522.82. ROA.1593-99.

On January 24, 2025, Dr. Young filed a timely notice of appeal. ROA.1600.

STATEMENT OF FACTS

**Dr. Young's work for Sunrise Medical and Expansion Media Telemed Group.**

Dr. Young was an award-winning emergency room physician who worked largely in the Hill Country region of Texas, which is in the Western District of Texas. ROA.4005-06, 4200-01. There was no evidence presented in the course of trial that Dr. Young performed any of the alleged actions in the Northern District of Texas or even visited the Northern District of Texas.

In 2017, Dr. Young sought to supplement his income, as many hospital physicians do, by taking patient chart review jobs. ROA.4029-39, 4200. He was offered multiple such engagements through a company called Encore Telemedicine/ Locum Tenens USA, a company that connected doctors with temporary or remote jobs. ROA.4110-11, 4122.

One of the chart review engagements that Dr. Young accepted involved a company called Expansion Media. ROA.4031, 4110-11, 4169. Steven Richardson, the CEO of Expansion Media, emailed Dr. Young on July 11, 2017, and wrote that his company had contracted with Encore "to complete telemed cases." ROA.4858.

Another side job involved a company called Sunrise, a company that was based in Florida. ROA.2349, 4031. Steve Kahn was the head of Sunrise, and Pamela Edwin interacted with Dr. Young as well. ROA.2352, 3963-3965, 4039, 4101.

In the work for both Expansion and Sunrise, Dr. Young believed that his job was to review charts that had been prepared by medical professionals who had evaluated the patients and who had prepared medical charts and orders. ROA.3964-64, 4051-52, 4055-56. Emails from Richardson and others showed that Dr. Young was told that others had prepared the charts. Richardson wrote, "All patients will be fully triaged and recorded before you ever get the request." ROA.4111-4113, 4858. When first told about Sunrise, Dr. Young received emails indicating that the job was a "chart review" position and that involved "no phone calls." ROA.4036-38.

In fact, it turned out that Expansion Media and Sunrise Medical did not have medical professionals preparing the charts. ROA.3108-09. Pamela Edwin of Sunrise acknowledged at trial that staff at Sunrise made up fake information about many patients. ROA.2377-78, 2455, 2458, 2579, 2597.

Dr. Young believed that his engagement was to assess patient charts and prescribe braces if he concluded that these orthotics were medically necessary and appropriate. ROA.4069-70, 4158. He reviewed most charts without talking with patients because, as he testified, he believed that the patients had spoken with medical professionals who prepared the charts that he reviewed. ROA.3964-65, 4037-38, 4051-52, 4055-56, 4111-4113, 4858.

Dr. Young reviewed charts for Expansion and Sunrise on an online medical records platform called DMERX. ROA.3964-65, 4040-41. The system was set up

so that when Dr. Young reviewed a chart and entered a prescription, the system then auto-generated a full set of medical orders based on template language. ROA.4053-54. The system was set up so that doctors were told to review the final set of orders based on the template language, but there was no evidence that Dr. Young actually reviewed or saw the final version of the orders or was aware of the false language that the system auto-generated.[1] *See also* ROA.2982-84 (testimony by Dr. Haas about DMERX system auto-generating text in orders that she was not aware of at the time), 4062-63 (testimony by Dr. Young that he was able to complete charts without previewing orders).

The resulting auto-generated orders included information that was false. Many orders included template language that Dr. Young had "personally performed the assessment of the patient," which he never did (having just assessed the patient *charts*), or that he had spoken personally with the patient, which he only did in a small number of instances. *See, e.g.*, ROA.3084-85, 4174-75. There was no evidence that Dr. Young ever typed such language into the charts himself or that he was actually aware of the language.

Metadata presented at trial showed that Dr. Young's review of charts did not take long. ROA.4049-50, 4052. Dr. Young explained that he believed that the charts

---

[1]    Dr. Young also reviewed some charts for Expansion using an electronic signature program, Docusign. ROA.3015-16, 3029.

had been prepared by medical professionals and that, as a longtime emergency room physician, he was accustomed to reviewing patient charts and making medical decisions very quickly. ROA.3964-65, 4011-14, 4037-38, 4051-52, 4055-56, 4111-4113, 4219-20, 4858. He testified that he did review every chart before deciding to enter a prescription. ROA.4003, 4064-65. There were times when he prescribed some of the braces that had been requested by patients while disapproving others. ROA.4061-62, 4069-70, 4099-101, 4114, 4211.

Dr. Young was paid $15 or $30 per chart that he reviewed, not based on the number of braces that he ordered. ROA.2049, 3989-90, 4039-40, 4102, 4114.

There was no evidence at trial that Dr. Young signed any charts for braces in the Northern District of Texas, including the charts for the patients referenced in Counts II through IV.

### "Red Flags" regarding Braces

The government presented testimony and evidence that braces should be ordered by physicians who have a physician-patient relationship. ROA.2753-54, 3497-. Dr. Young testified that he believed that he was acting as the patient's physician in ordering braces, ROA.4102, 4130, 4213-14, just as he acts as a patient's physician when prescribing medication or braces in the emergency room, where his ad hoc, fleeting relationship with each patient is often momentary and largely based on little more than a rushed review of the patient chart prepared by others.

Over the course of the trial, the government presented evidence that Dr. Young received information that arguably indicated possible problems with Expansion and Sunrise.

In October 2017, Dr. Young's wife sent an email on Dr. Young's behalf to Steven Richardson about a call that Dr. Young had received. ROA.4115-17. The patient said that she was "turning" Dr. Young into the Arkansas attorney general's office and had accused him of "fraud." ROA.4866. The government did not call the patient and did not present any additional evidence about this email. In the defense case, a record from the Arkansas Attorney General's office was admitted, showing no record of a complaint against Dr. Young. ROA.3888-90. Dr. Young testified that he had talked with the patient's relative and that the call ended without problem. ROA.4115-17.

In February 2018, Dr. Young received a mass email from Dr. David Weitzman warning doctors about possible investigations. ROA.4869-70. Weitzman wrote that "several of our fellow telemedicine physicians have been placed under CMS (Medicare) investigations for DME or prescription medications." ROA.4869-70. Weitzman also wrote that "Medicare patients must have a face to face evaluation before they can be legally issued an RX [prescription] for either a DME or Prescription medication." ROA.4869-70. Dr. Young testified that he did not know Dr. David Weitzman and did not know what to make of the email, and that he

believed that the statement about a face-to-face evaluation being required for a DME prescription was incorrect.  ROA.4118-22.

After receiving Dr. Weitzman's email, Dr. Young emailed Steven Richardson at Expansion Media and his contacts at Encore (he was not working for Sunrise at the time).  He wrote to both, "I was informed by several fellow telemedicine physicians who have been placed under CMS (Medicare) investigations for DME or prescription medications.  Medicare patients must have face to face evaluations before they can be legally issued an RX for Prescription medications." ROA.4871.[2]

Richardson testified that he might have responded to Dr. Young's email. ROA.3070-71.  Richardson said that if he did respond, he would have tried not to answer Dr. Young's question.  ROA.3071.  According to Richardson, if Dr. Young had pushed, he would have "tried to say they are triaged and recorded and ready to

---

[2]  The government argued at trial and in its closing argument that Dr. Young's "edit" of Dr. Weitzman's email showed his knowledge of the law and an attempt to "cover up his participation in the fraudulent scheme."  *See* ROA.4491-92.  But Weitzman's statement about braces was incorrect as a matter of law.  Federal law does require doctors to have face-to-face evaluations before ordering controlled substances by means of the Internet.  *See* The Ryan Haight Online Pharmacy Consumer Protection Act of 2008 (Pub. L. No. 110-425), which amended 21 U.S.C. § 209.  But no federal law specifically requires a face-to-face evaluation before a doctor orders a brace.  During trial, the government's Medicare expert acknowledged on cross-examination that there was no Medicare regulation in the 2017-19 period that required doctors to conduct face-to-face evaluations in order to prescribe braces.  ROA.2242.  The expert acknowledged that face-to-face evaluations were required for other items, such as power wheelchairs, but not for the braces at issue in this case.  ROA.2243. According to the evidence presented at trial, knee braces do require an assessment that can only be done in-person, but nothing requires the ordering physician to personally do the assessment.  ROA.2248-51.  Orders presented to Dr. Young indicated that such an assessment had already been done by other medical personnel in the course of the charts being prepared.

go" and that "everything is good," and he would also have said that doctors are "supposed to call patients" but that many did not. ROA.3071.

Dr. Young also explained that he believed that braces were less risky than other things. In March 2018, he informed Encore that he wanted to stop work involving prescription medications because of some calls that he had received from patients and insurance companies. ROA.4148-49. He asked, "[i]s it possible to only send brace prescriptions my way in this portal?" ROA.4148-49. He explained that he believed at the time that he could order braces and that he was comfortable ordering braces. ROA.4148-49.

In April 2019, Dr. Young heard about the Department of Justice's "Operation Brace Yourself," which involved the arrests of people associated with braces and telemedicine. ROA.4150. Dr. Young then received an email from Encore that "none of our clients are caught up in the fraudulent Medicare scandal." ROA.4152-54.

Dr. Young also met with Pamela Edwin from Sunrise in-person. ROA. 2555-57, 4150-52. She did not tell him that Sunrise offices had just been searched by law enforcement, and she told him that Sunrise was continuing to operate as before. ROA.2555-57, 4151-52. Dr. Young testified that he believed Sunrise did employ medical professionals and was a legitimate company, and on April 25, 2019, he recommended a nurse that he worked with in his emergency room to work for

Sunrise. "She would be able to streamline visits whether that be DME, Cancer charts." ROA.2555-57, 4971-79.

Ultimately, Dr. Young testified under oath that he did not enter into an agreement with anyone to commit health care fraud and did not knowingly put false information into patient charts. ROA.4000-03

### Dr. Young's Work for Momentum

In July 2018, Dr. Young was asked by Encore about another chart review engagement, this time with Clifford Powell at Momentum, which was "looking for providers to complete his lab consults (cancer screenings)." ROA.3795-97, 4122-25, 4882. He was offered $30 per consult. ROA.4122-24, 4882. The job involved reviewing charts that were prepared by Momentum or its colleagues. ROA.3795-97, 4122-25, 4882.

At trial, the government presented testimony and evidence that genetic tests should be ordered by physicians who have a physician-patient relationship with the patient. ROA.3496-99. The government did not present evidence of any rules specifically stating how or when a physician-patient relationship was formed, and the government's Medicare expert acknowledged that there was no Medicare requirement in the 2017-19 period that a physician had to personally conduct a face-to-face examination to order genetic tests. ROA.2254. There was no evidence

presented at trial that Dr. Young knew the actual Medicare requirements for genetic tests.

One disputed issue focused on whether Dr. Young claimed to have talked with patients. There was no dispute that Dr. Young did not talk with patients, and there is no Medicare regulation that specifically requires a phone call before a doctor orders a genetic test with a patient. Dr. Young testified that he believed that he was acting as the patient's physician when working for Momentum. ROA.4130.

Clifford Powell testified for the prosecution about an initial call he had with Dr. Young on July 11, 2018. ROA.3189. Powell testified that he told Dr. Young in an initial call that he would have to speak with each patient before approving genetic tests for the patient. ROA.3192-93. Dr. Young acknowledged this call when he testified. ROA.4124-26.

But the day after the July 11 call, Powell sent an email to Dr. Young and other doctors about the process that doctors were to follow and that did not mention phone calls. ROA.3395-97. About two weeks later, on July 23, 2018, Powell and Dr. Young had another phone call that lasted 15 minutes, according to phone records. ROA.4127-29. Powell said that he did not recall this conversation. ROA.3393-94. Dr. Young testified that he told Clifford Powell around this time that he would not be able to talk with patients given his schedule in the emergency room. ROA.4124-

26.  Dr. Young testified that Powell acknowledged that Dr. Young would not talk with patients.  ROA.4124-26.

There was also a dispute as to a January, 2019, call that may have related to whether or not Dr. Young talked with patients.   In January 2019, Powell's wife Lindsay, who also worked at Encore, sent an email to Powell about Dr. Young doing a "batch" of signatures at one time "instead of doing some every other day or so." ROA.5015.  Powell testified that he called Dr. Young, and that Dr. Young said that he was talking with patients over time and was signing charts all at once.  ROA.5015. Powell said that this conversation was lasted "less than ten minutes, more than three."  ROA.3375.  Phone records for January 2019 showed only one call between Dr. Young and Powell and that this call was one minute or less.  Def. Ex. 194.  Dr. Young denied having this conversation and said that he never claimed to have spoken with Momentum's patients. ROA.4133-34.

The government presented an email in which a lab employee wrote that Amy Fields, who was described as a primary-care physician, had called about a patient and claimed during the call that Dr. Young had denied ordering a genetic test for that patient.  ROA.3368-70.  In the defense case, the lab employee testified that she did not recall writing this email or having the telephone call described in the email. ROA.3848.  Evidence showed that the email was incorrect as to Fields' profession – she was a lab director.  *See* ROA.3591, 3601.  Dr. Young testified that he did have a

call with Fields, that he did not know who she was, and that in the call he neither denied ordering the test nor asked for more information.  ROA.4134-36.

Powell said at trial that he had committed the crime of health care fraud, but acknowledged on cross-examination that the crime he pled guilty to was different and involved kickbacks.  ROA.3415-16.  There was no evidence that Dr. Young was aware of or was involved in kickbacks involving Powell's company.  In the defense case, Matthew Harrington also testified that he had not agreed with Dr. Young, Steve Kahn, Pamela Edwin, or "anyone" to commit health care fraud.  ROA.3876-77. "I've never agreed with anyone to commit health care fraud," he said.  ROA.3877.

There was no evidence that Dr. Young signed any charts for Momentum in the Northern District of Texas.  One person who worked for Momentum, Trudy Payton, testified at trial about working for Momentum in the Northern District of Texas, but had no interaction with Dr. Young.  ROA.3120-23, 3146.

There was no evidence at trial that Powell or anyone at Momentum worked with Sunrise, Expansion, or any other companies regarding braces.  There was no evidence that any of these companies collaborated or otherwise had any connections with each other, beyond each having separately contracted with Dr. Young to perform chart reviews.  There was no evidence that Dr. Young knew that prescription orders were embellished by these companies after he electronically submitted the prescriptions, how orders were placed, how any such orders were fulfilled or by

whom, how any of the billing was performed, how much was billed to Medicare or others, or how much was ever paid.

SUMMARY OF THE ARGUMENT

This case is controlled by a prior decision by this Court, *United States v. Ganji*, 880 F.3d 760 (5th Cir. 2018), which overturned the conviction of a doctor for her role in an extensive health care fraud scheme for insufficient evidence on strikingly similar facts. Because the evidence was not sufficient to establish Dr. Young's actual knowledge of the fraud, there was insufficient evidence to sustain the convictions for conspiracy (Count I) and false statements (Counts II, III, and IV). Moreover, under the "essential conduct elements" test required by the Supreme Court and this Court's precedents, there was no evidence to support a finding of venue in the Northern District of Texas for the conspiracy in Count I, as alleged in the superseding indictment. Venue was improper for the false statement counts as well, because the sole conduct element for venue is the "making" of the false statement, and there was no evidence that Dr. Young ever "made" any statement in the Northern District of Texas or that the statements were sent by others to the Northern District of Texas.

Further, the district court committed reversible error in allowing, over objection, the opinion testimony of other physicians who had engaged in telemedicine practice that they thought *their* conduct was fraudulent, for the purpose

17

of showing that Dr. Young also knew that he was involved in a fraudulent scheme. Under FED. R. EVID. 403, this evidence was irrelevant to Dr. Young's knowledge, and any arguable relevancy was far outweighed by its prejudicial effect.

The district court also committed reversible error in refusing to charge the jury with a multiple conspiracy instruction and to require the jury to determine whether the conspiracy alleged in Count I even existed. This is so because the evidence at trial established, at most, several separate conspiracies, not the broad, overarching conspiracy alleged in the superseding indictment.

Finally, the sentence in this case must be vacated because the district court applied the wrong measure in applying and determining "intended loss," using the gross amounts billed by DME and genetic testing companies without Dr. Young's knowledge, instead of "actual loss" based on what an unknowing defendant "reasonably should have known." The district court also improperly attributed all the payments for braces and genetic tests without making appropriate findings as to when Dr. Young had sufficient knowledge to be criminally responsible for loss.

## ARGUMENT AND AUTHORITIES

### I.    THE EVIDENCE WAS CONSTITUTIONALLY INSUFFICIENT

This case bears striking similarities to a prior decision by this Court, *United States v. Ganji*, 880 F.3d 760 (5th Cir. 2018), in which this Court overturned the conviction of a doctor for her role in an extensive home health fraud scheme.  Like Dr. Young, Dr. Ganji certified patients for something that was billed to Medicare for patients who did not actually qualify for that service (home health, as opposed to DME and genetic tests).  Like Dr. Young, Dr. Ganji did not have direct interaction with the patients and relied on information that she was provided by others.  And like Dr. Young, the government's evidence that Dr. Ganji had sufficient knowledge of the overall crime ultimately was too weak and indirect for a conviction to stand – "should have known" better, especially with the benefit of hindsight, is not the same as actual knowledge at the time of the alleged crimes.  Both doctors were negligent and perhaps reckless, but the government's evidence was not enough to sustain a conviction for Dr. Ganji and is not enough to sustain the conviction for Dr. Young, both viewed at the end of the government's case and based on the trial overall.

### A.    Standard of Review

When a court considers sufficiency of the evidence, "[t]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond

a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). This Court reviews "de novo the district court's denial of [their Federal Rule of Criminal Procedure] 29 motion for a judgment of acquittal." *United States v. Mitchell*, 484 F.3d 762, 768 (5th Cir. 2007). In determining the sufficiency of the evidence for any element, the court considers the evidence, all reasonable inferences drawn therefrom, and all credibility determinations in the light most favorable to the prosecution. *United States v. Ramos–Cardenas*, 524 F.3d 600, 605 (5th Cir. 2008).

## B.    Elements

For a conviction for conspiracy to commit health care fraud to stand, a reasonable finder of fact must be able to conclude that the government in this case proved beyond a reasonable doubt that (1) Dr. Young and at least one other person made an agreement to commit health care fraud, (2) that Dr. Young knew the unlawful purpose of the agreement, and (3) that Dr. Young joined in the agreement willfully, that is, with the intent to further the unlawful purpose. *See United States v. Hamilton*, 37 F.4th 246, 257-8 (5th Cir. 2022). For a jury to conclude that Dr. Young agreed to commit healthcare fraud, a reasonable finder of fact must be able to conclude that he acted "knowingly and willfully." *Id.*, 18 U.S.C. 1347.

To sustain a conviction for making a false statement in a health care matter (Counts II, III and IV), a reasonable finder of fact must be able to conclude that the government proved beyond a reasonable doubt that "(1) the defendant made a

materially false, fictitious, or fraudulent statement or misrepresentation;  (2) in connection with the delivery of [or payment for] health care benefits; and (3) [s]he did so knowingly and willfully."  *Hamilton*, 37 F.4th 246 at 260.

"Willfully" requires proof that an act was committed "voluntarily and purposely with the specific intent to do something the law forbids; that is to say, with bad purpose either to disobey or disregard the law."  *See United States v. Davis*, 132 F.3d 1092, 1094 (5th Cir. 1998) (approving a jury instruction that defined "willfully" in this way).  "Willfully" requires more than negligent or reckless behavior.  *See United States v. Nora*, 988 F.3d 823, 832 (5th Cir. 2021) (overturning conviction because "even if a reasonable person in [defendant's] shoes *should have known (or at least suspected)* that ghosting was unlawful, that would only make [defendant] guilty of negligently participating in a fraud – it does not prove that [defendant] acted "willfully' in facilitating ghosting and the fraud it furthered") (emphasis supplied).

## 1.    <u>Conspiracy to Commit Health Care Fraud (Count I)</u>

In the *Ganji* case, "none" of the government's 18 witnesses "could provide direct evidence of their alleged co-conspirator's actions because the witnesses never acted with the defendants to commit the specific charged conduct."  *Ganji*, 880 F.3d at 766.

So too here.  The government called no witness who acted with Dr. Young in reviewing charts and certifying patients for DME or genetic tests.  No government

witness was present when Dr. Young reviewed charts, and no one acted with him in reviewing and approving charts.

In the *Ganji* case, none of the government's witnesses testified that they had agreed with Dr. Ganji to commit health care fraud.  As the Fifth Circuit noted, doctors and nurses "spoke of their own fraudulent actions, but they never testified that they agreed with Dr. Ganji [or a co-defendant who was a marketer] to carry out these activities." *Id*. at 770.  These witnesses "did not implicate Dr. Ganji" in their own fraud, and two did not even know Dr. Ganji.

So too here.  Only one of the six people specifically identified in the superseding indictment as conspiring with Dr. Young to commit health care fraud testified in the government's case (Clifford Powell), and he did not testify that he agreed with Dr. Young to commit health care fraud.  As with the other witnesses, Powell supplied no testimony that Dr. Young was informed, or otherwise knew, that any of the orders contained false information.

As for the other government witnesses who admitted committing health care fraud, none testified that they agreed with Dr. Young to commit health care fraud.

- Dr. Haas did not testify that she agreed to commit health care fraud with Dr. Young, and was unknown to him before trial.

- Pamela Edwin did not testify that she agreed with Dr. Young to commit health care fraud.  Moreover, she testified about misleading Dr. Young and about inaccurate information she knew was given to Dr. Young without correction, which is irreconcilable with an agreement to commit health care fraud.

- Steven Richardson did not testify that he agreed with Dr. Young to commit health care fraud. Instead, he testified about how he misled Dr. Young, which is inconsistent with an agreement to commit health care fraud.

Significantly, when Dr. Young called in his defense case two of the people with whom he was specifically accused of conspiring, they too did not testify that they agreed with Dr. Young to commit health care fraud. Witness Matthew Harrington acknowledged violating the Anti-Kickback Statute, but he said that he did not believe that he was committing health care fraud and did not agree with anyone else to do so. ROA.3876-77. And Steven Kahn only said that he agreed with doctors "like Dr. Young" to commit health care fraud, rather than ever testifying that he agreed with Dr. Young himself. ROA.3978.

In the *Ganji* case, the government tried to prove conspiracy via a "concerted action" theory. The government there called a doctor (Dr. Winston Murray) and two marketers (Louella Hendricks and Kimberly Celestine), all of whom admitted fraudulently certifying patients for home health care, and the government tried to argue that Dr. Ganji must have conspired to commit health care fraud because of the alleged similarities with Dr. Murray's conduct.

This Court stated in *Ganji* what the government must prove in a "concerted action" conspiracy case:

> What people do is logical, albeit, circumstantial, evidence of what lies in their mind. As such, the law has evolved to accept concerted action when a formal agreement cannot be found. Nevertheless, this concert of action must

illustrate a conscious commitment to a common scheme designed to achieve an unlawful objective. The actions and the surrounding circumstances must be incriminating enough to warrant a finding that the Government proved the existence of an agreement beyond a reasonable doubt.

\* \* \*

Concert of action can be proven through indirect, circumstantial evidence. However, when proving an agreement exists by using the concert of action theory, the Government must present evidence of the conspirators' individual actions that, taken together, evidence an agreement to commit an unlawful objective beyond a reasonable doubt.

*Id*. at 768-69.

Ultimately, this Court held that the "quality and probative strength" of the government's evidence in *Ganji* fell "well short." *Id*. at 772.

So too here. The only doctor who could potentially be compared to Dr. Young under a concerted action theory was Dr. Shannon Haas, and the evidence showed that her practice was very different from Dr. Young's, including her personal commission of crimes that Dr. Young did not commit.

- On cross-examination, Dr. Haas admitted that she put false information into patient charts claiming that she had performed tests which she knew could only be done in-person and which she knew she had not done, both with Sunrise and with another company. ROA.2957, 2975-76. By contrast, Dr. Young did not put such false information into charts, and he

believed (perhaps naively) that nurses had performed the tests that were described in the charts that he reviewed.

- On cross-examination, Dr. Haas admitted that even before she worked for Sunrise, she knew that she was getting paid by one company based on the specific kinds of braces she ordered, a method which she admitted she knew violated the Anti-Kickback Statute. ROA.2964. By contrast, Dr. Young was never paid by any company in such a way and believed that he was being paid in a way that was perfectly legal.

Ultimately, this Court held that the government's theory that Dr. Ganji conspired to commit health care fraud because Dr. Murray conspired to commit health care fraud was "void of testimonial support." *Id*. at 772. This Court found that the record showed that the two physicians, "who carried out private practices in two different locations, conducted those practices differently," and thus the government's proof of Dr. Murray's illegal activity "cannot sustain its burden against Dr. Ganji." *Id*.

So too here. The government tried to present Dr. Haas as if she was just like Dr. Young, but the actual record showed that the two were very different, just like Dr. Murray was very different from Dr. Ganji. Here, Dr. Haas personally and knowingly committed crimes that Dr. Young did not and that involved clear

violations of law, and she thus acted with knowledge and willfulness that Dr. Young did not. This hardly constitutes "concerted action."

Moreover, the evidence overall showed that Dr. Young was intentionally kept in the dark by his alleged co-conspirators and did not know most of the key facts about the overall scheme. This case is thus distinguishable from cases where this Circuit has affirmed convictions based on common types of evidence that help supply the evidence of knowledge necessary to show willfulness and agreement to commit health care fraud. A review of such cases helps show the contrast with Dr. Young's case.

Take *United States v. Willett*, 751 F.3d 335 (5th Cir. 2014), where the evidence was sufficient to sustain the convictions. The evidence there showed classic types of evidence which are not present here:

- *Consciousness of guilt*: Defendant said "I almost feel guilty about that" and then laughed and said "no, I don't," in a tone that a witness described as "bad …like something was being done and he was being kind of cocky about it." *Id*. at 340. The defendant also dismissed concerns raised by a biller who was terminated afterwards. *Id*. at 342.[3]

---

[3] Regarding consciousness of guilt, *see also United States v. Sanders*, 952 F.3d 263, 274 (5th Cir. 2020) (defendant fired an employee for refusing to lie on documents and admonished a doctor for failing to bill extra time for patients whom the doctor said did not need it).

- *Knowledge of the amounts of Medicare payments*:  Defendant was familiar with the company's receipts and profit margins averaging more than 1,607%. *Id*. at 341-42.

- *Proximity to fraud*:  Defendant was present when his co-defendant and wife altered delivery tickets.  *Id*. at 340.

Another useful case to consider is *United States v. Little*, No. 21-11225, 2023 WL 7294199, *4 (5th Cir. 2023).  The evidence there also showed classic types of evidence which are not present here:

- *Consciousness of guilt*:  Defendant was recorded saying that he had been engaged in "shady" behavior and had "worked in the gray areas for years." *Id*. at *4.  Defendant was also involved in moving patients to another hospice when one hospice was suspended by Medicare.  *Id*.

- *Pre-signing of blank orders*:  Defendants pre-signed documents that were used by people who were not medical professionals to enroll patients in hospice. *Id*. at *4-5.[4]

---

[4]  Pre-signing of forms was also a factor in *United States v. Ezukanma*, 756 F. App'x 360, 367 (5th Cir. 2018) (defendant signed blank orders and "likely" signed other forms without reading them) and *United States v. Robinette*, 832 F. App'x 261, 265 (5th Cir. 2020) (doctor signed forms without seeing the patients *or their charts* and at one point signed stacks of patient certifications that were brought to him while he was in rehabilitation for alcohol abuse and did not have access to patient charts).

Other cases have shown direct contact by defendants with patients that established defendants' actual knowledge of falsity. *See United States v. Martinez*, 921 F.3d 452, 469-70 (5th Cir. 2019) (doctor was present at multiple clinics and thus had a "unique vantage point for observing the suspicious nature of the operation," and doctor billed Medicare for 45-minute examinations after seeing patients for just a few minutes), *United States v. Brown*, 354 F. App'x 216, 220 (5th Cir. 2009) (defendant ordered power wheelchairs for patients who walked into the clinic where she briefly saw them and thus knew that they were not currently using a wheelchair, not suffering from physical limitations that made a wheelchair necessary, and were capable of using a manual wheelchair).  Here, Dr. Young lacked such knowledge and believed that patients had been seen by another medical professional and that the charts he was reviewing accurately described the patients – he was arguably naïve to believe this, but he did not have the actual knowledge required to have acted willfully.

Other cases have involved clear evidence that defendants had sufficient knowledge of Medicare rules and requirements to establish their willfulness.  *See United States v. Read*, 710 F.3d 219, 225-27 (5th Cir. 2012) (defendants had been "informed three times" via letters that they were overutilizing the ambulance services at issue and that they did not respond to these letters, and the evidence showed that defendants were "familiar with regulations governing reimbursement,"

in part because they had a book of Medicare billing regulations that had been highlighted, written in, and bookmarked), *United States v. Crawley*, 381 F. App'x 462, 465 (5th Cir. 2010) (defendant attended a Medicare billing seminar and "advocated the continued use of [the improper] billing practice even after she learned the practice was improper"). Here, Dr. Young did not understand the Medicare rules – his failure to do so shows his negligence or recklessness, but is insufficient to show willfulness. Overall, the government's evidence here was very different from other cases that this Court has reviewed. Here, the government's evidence established that Dr. Young may have engaged in "lax practices" or "negligence" or conducting business "haphazardly," just like this Court acknowledged the government had shown regarding Dr. Ganji. *Ganji*, 880 F.3d at 777. But this is insufficient for a conviction of conspiring to commit health care fraud, just like this Court held with Dr. Ganji. Here, there was no evidence of a meeting of minds between Dr. Young and any of the alleged co-conspirators to commit health care fraud, and thus there was no agreement.

Ultimately, the evidence presented in the government's case-in-chief was insufficient as a matter of law, as was the evidence presented overall, and the conviction on Count I accordingly should be vacated.

In the alternative, the Court should find that the district court abused its

discretion in denying Dr. Young a new trial on this basis.[5]  In its order (ROA.1521-27), the district court did not discuss the *Ganji* case or the similarities between that case and this one.  Instead, the district court cited a handful of factors:  (1) Dr. Young's allowing Sunrise to prepare the charts that he reviewed, (2) Dr. Young's speed in signing the charts, (3) the large number of prescriptions that he filled, (4) his continuing to sign charts after "hearing of patient complaints of fraud,"[6] and (5) the government's expert's opinion about how an assessment should be done.  These factors are sufficient to establish that Dr. Young was negligent or perhaps even reckless, but they are insufficient to establish that he acted with knowledge that his conduct was illegal.  *See United States v. Tarango*, 396 F.3d 666, 672 (5th Cir. 2005) (no abuse of discretion in ordering a new trial in a health care fraud case when there was little evidence directly implicating the defendant's knowledge of fraud).

## 2.    <u>False Statement Charges (Counts II through IV)</u>

Just as the government's evidence was insufficient for Count I, the evidence was insufficient for the false-statement counts.  Again, the *Ganji* case is instructive.

---

[5]  Whereas a Rule 29 motion turns on the *sufficiency* of the evidence, a Rule 33 motion for new trial turns on whether the *weight* of the evidence supports the verdict. *See Tibbs v. Florida*, 457 U.S. 31, 42 (1982).  This Court reviews the denial of a motion for new trial for abuse of discretion. *See, e.g., United States v. Simmons*, 714 F.2d 29, 31 (5th Cir. 1983).

[6]  The evidence showed only one complaint to Dr. Young about fraud by a relative of an Arkansas patient, and the evidence showed that Dr. Young believed that this complaint was based on incomplete information and was resolved with a "congenial talk," not with an accusation of criminal conduct.  ROA.4115-16.

The *Ganji* Court held that the government's evidence of health care fraud was insufficient. The Court found that the government had proved that a patient was not homebound at the time that Dr. Ganji certified the patient for home health services, but also found that the government had *not* provided sufficient evidence that Dr. Ganji *knew* that the patient was not homebound at the time:

> Beyond proving that [the patient] did not need home aid, the Government was to prove, beyond a reasonable doubt, that Dr. Ganji was aware of that reality. Unlike other health care fraud cases presented to this Court, the Government did not provide testimonial or documentary evidence proving that Dr. Ganji knew Stewart was not homebound. It presented evidence of [the patient's] primary care physician's knowledge but it failed to present any evidence imputing that knowledge to Dr. Ganji. The evidence allowed the jury to infer that [the patient] was not home-bound, but it cannot stretch that into a second inference that Dr. Ganji knew [the patient] was not homebound.

*Id*. at 777-78.

So too here with the false-statement counts against Dr. Young.

The government proved that the three patients referenced in Counts II through IV did not need all of the braces that Dr. Young ordered, but they did not prove that Dr. Young *knew* that they did not need those braces.

The evidence showed that Dr. Young reviewed charts that showed that the patients had already been examined, that they complained about pain that was severe and of a longstanding nature, and they were requesting braces. The evidence at trial

showed that some of this information about Patients A.H., S.T. and K.A. was accurate and that some was not accurate. But the evidence did not show that Dr. Young *knew* that the inaccurate information was inaccurate, and the evidence did not show that Dr. Young *knew* that braces were not actually necessary or appropriate for the patients. Accordingly, the evidence was insufficient to sustain the false statement counts on the basis of the certifications themselves.

In *Ganji*, the government also tried to argue that Dr. Ganji committed fraud because she certified a patient for home health services even though she was not the patient's primary care physician and thus the patient was not under her care. This Court rejected this theory because it was not actually supported by Medicare regulations, and found that Dr. Ganji "cannot be held liable for fraudulence as a result of activity that is legal." *Id*. at 778.

So too here. Medicare regulations did not require Dr. Young to conduct face-to-face examinations or telephone calls with patients before ordering braces for the patients, and they did not require him to be the patients' primary-care-physician before ordering braces for the patients. Accordingly, the government's theory that Dr. Young made a false statement by virtue of ordering a brace for a patient whom he had not talked with is invalid. Dr. Young's belief was that he was the patient's physician and could order a brace for them. The government disagrees, but that does not make his statement false.

In the alternative, the Court should find that the district court abused its discretion in denying Dr. Young a new trial on this basis. In its order, the district court did not discuss the *Ganji* case or the similarities between that case and this one. Instead, the district court cited the text of the orders that were auto-generated by the DMERX system *after* Dr. Young reviewed and approved the charts. ROA.1523. As noted above, the text was indeed false as it referred to indicating that Dr. Young personally completed exams, but there was no evidence showing that Dr. Young actually knew that such text was even in the orders. Again, even if the evidence was sufficient to establish that Dr. Young was negligent or perhaps even reckless in not suspecting that the DMERX system had inserted false text into his orders, it was insufficient to establish that he acted with actual knowledge that the charts were cleverly fabricated or that any of his conduct was illegal.

## II.    The Evidence Was Constitutionally Insufficient to Prove Venue and Vicinage

"[T]he burden of proving that the crime occurred in the district of trial is squarely on the prosecution." *United States v. Romans*, 823 F.3d 299, 316 (5th Cir. 2016). The superseding indictment alleged that the offenses were committed in the Northern District of Texas. They were not.

The Constitution, in two different places, guarantees a defendant the right to be prosecuted in the district where the alleged offense was committed. U.S. CONST. art. III, § 2, cl. 3; U.S. CONST. amend. VI. This right was important enough to the

Founders that it and the  right to trial by jury are the only rules of criminal procedure included in both the original Constitution and the Bill of Rights. *See generally, U.S. v. Cabrales,* 524 U.S. 1, 6 (1998); Steven A. Engel, *The Public's Vicinage Right: A Constitutional Argument,* 75 N.Y.U. L. REV. 1658, 1680–91 (2000) (chronicling the history of the vicinage right). The right is restated in FED. R. CRIM. P. 18.

Although they command the same result, this right derives from two separate clauses in the Constitution: the Venue Clause in Article III, and the Vicinage Clause in the Sixth Amendment. The "structural" Article III Venue Clause and the Sixth Amendment Vicinage Clause that is framed in terms of a defendant's right serve both "the community's interest in law enforcement as well as the defendant's right to a fair trial." *Romans,* 823 F.3d at 325; Engel, at 1681. The Venue Clause in Article III provides that a criminal trial must be "shall be held in the State where the said Crimes shall have been committed."

The coverage of the Vicinage Clause "reinforce[s]" the structural Venue Clause because, in protecting the right to a jury drawn from the place where a crime occurred, it functionally prescribes the place where a trial must be held. *United States v. Rodriguez-Moreno*, 526 U.S. 275, 278.  But the Vicinage Clause differs from the Venue Clause in that it concerns jury composition, not the place where a trial may be held, and specifies that a jury must be drawn from "the State and district wherein the crime shall have been committed."

"The locus delicti must be determined from the nature of the crime alleged and the location of the act or acts constituting it." *Cabrales,* 524 U.S. at 6-7. Thus, to determine where an offense was committed, "a court must initially identify the conduct constituting the offense (the nature of the crime) and then discern the location of the commission of the criminal acts." *Rodriguez-Moreno*, 526 U.S. at 279. The "essential conduct elements" of the offense are determined from the statutory language. *Id.* at 279-80. This is a statute-by-statute analysis.

To be clear, Dr. Young does *not* dispute that venue would have been appropriate in the Northern District of Texas if he had been charged with and convicted of health care fraud (18 U.S.C. § 1347), like the defendant in *United States v. Ubak-Offiong*, 364 F. App'x 859 (5th Cir. 2010), a case cited by the district court when denying Dr. Young's Rule 33 motion. *See* ROA.1524. But he was *not* charged with health care fraud.

He also does *not* dispute that venue would have been appropriate if there was evidence showing that the prescription orders that he created had been sent to the Northern District of Texas, as the district court said in its order. *See* ROA.1524. But there was *no* evidence to this effect. The evidence showed that Dr. Young reviewed charts and signed electronic prescriptions at places in the Western District of Texas and that the orders were accessed by people at Sunrise in Florida, but there was no evidence as to the geographic location where the resultant orders may have been sent

by Sunrise afterwards.  Significantly, there was no evidence presented at trial or at sentencing as to where the DME companies that sent braces to the patients referenced in Counts II through IV were located.[7]

### A.    Conspiracy to Commit Health Care Fraud

This Court has held that venue in conspiracy cases is proper in any district where the agreement was formed or where an overt act in furtherance of the conspiracy was performed by at least one of the co-conspirators.  *See United States v. Lee*, 966 F.3d 310, 319 (5th Cir. 2020), *cert. denied*, 141 S. Ct. 639 (2020).  A defendant can be tried in a district where he has never set foot, but only if a co-conspirator committed acts in furtherance of the conspiracy in that district.  *See United States v. Rodriguez-Lopez*, 756 F.3d 422, 430 (5th Cir. 2014).

Here, there was no evidence that Dr. Young did any work relating to Sunrise, Expansion, or Momentum in the Northern District of Texas.  Everything he did was elsewhere, primarily in the Western District of Texas, where he resided and worked as an emergency-room physician.  Moreover, there was no evidence that Dr. Young's alleged co-conspirators performed any acts constituting the alleged crimes in the

---

[7] This lack of evidence distinguishes this case from *De Rosier v. United States*, 218 F.2d 420 (5th Cir. 1955), the case cited by the district court in its order.  In *De Rosier*, this Court found that venue was proper either in the place where the false statement was made (Florida in that case) or where the false statement was received (the District of Columbia in that case).  *De Rosier* did not find venue based on the *effects* of the false statement.

Northern District of Texas.  Sunrise and Momentum were based in Florida, and there was no evidence about where Expansion was based.[8]

As this Court noted in *United States v. Smith,* 22 F.4th 1236, 1243-44 (5th Cir. 2022), the *effects* of a crime are only relevant to venue when the statute defines the crime in terms of its effect, and even then only for the identified effect.  This Court has held consistently that overt acts do not establish venue when they relate only to a "circumstance element" and not an essential conduct element as defined by the statute proscribing the offense, distinguishing between "essential elements" of the offense and its "essential *conduct* elements." *See United States v. Clenney*, 434 F.3d 780, 781-82 (5th Cir. 2005) ("The government argues that venue exists under the terms of the statute [18 U.S.C. § 1204] because intent to obstruct the lawful exercise of parental rights is an element of the offense, and Carmichael's parental rights were violated in the Northern District. We disagree, because this element merely speaks to the offender's *mens rea* as he commits the conduct essential to the crime; it is plainly not an 'essential conduct element' as required by *Rodriguez-Moreno*."); *United States v. Strain,* 396 F.3d 689, 694 (5th Cir. 2005) ("The issuance of the warrant and Strain's knowledge of it, however, are 'circumstance elements' of the offense of harboring, insofar as they do not involve any proscribed conduct by the

---

[8] One witness testified that she met with patients in the Dallas area while working indirectly for Momentum in connection with *genetic tests*, but she was not a co-conspirator (ROA.4503) and her actions had nothing to do with prescriptions for *braces* or the false-statement counts.

accused. As such neither may serve as a basis for establishing venue.") (citations omitted). *Accord, United States v. Ramirez*, 420 F.3d 134, 144-45 (2d Cir. 2005) ("While a scheme to defraud is certainly one of three essential elements of mail fraud, it is not an essential conduct element ... [Thus,] having devised or intending to devise a scheme or artifice to defraud, while an essential element, is not an essential conduct element for purposes of establishing venue").

A few of the patients who ultimately received braces and genetic tests resided in the Northern District of Texas, but this is not sufficient for venue purposes for a conspiracy to commit health care fraud. This Court's decision in *United States v. Niamatali*, 712 F. App'x 417 (5th Cir. 2018), is instructive here, where a doctor who worked in the Northern District of Texas was charged in the Eastern District of Texas with conspiring to distribute controlled substances. *Id.* at 418. On appeal, the government argued that venue was proper because some prescriptions were filled in the Eastern District of Texas. *Id.* at 421. This Court rejected the government's argument, finding that venue could not be justified on this basis. *Id.*, at 422-23.

The superseding indictment charged Dr. Young with conspiring "in the Dallas Division of the Northern District of Texas," an allegation the Government did not prove by a preponderance of the evidence or with any evidence. The remedy for improper venue is vacatur of the conviction. *See Smith v. United States*, 599 U.S.

236 (2023).  The conviction for Count I must be vacated, and a new trial should be ordered in the Western District of Texas.

### B.    False-Statement Counts

Venue for the three false statement counts presents a simpler analysis, again revealing that the Northern District of Texas was the wrong district. Applying the essential conduct test, courts have routinely concluded that false statement offenses are not continuing offenses under 18 U.S.C. § 3237 and that the sole conduct element is the "making" of the false statement. The subject statute, 18 U.S.C. § 1035, is substantively indistinguishable from other false statement offenses in Title 18, proscribing the making or using of a materially false statement, without regard for its actual effect on the intended victim, usually the government. *See, e.g.*, 18 U.S.C. § 1001.

Dr. Young was alleged to have submitted three electronic prescription orders to Sunrise Medical through the DMERx platform for orthotic braces for specified patients in February of 2019, each such record containing "false statements and/or concealment of material facts." Each of those submissions was "made" by Dr. Young's pressing the "OK" button on the last page of the patient portal, transmitting the prescription order to Sunrise.  The government introduced evidence at trial of some instances when Dr. Young was outside the United States when he reviewed some orders, but the government failed to introduce any evidence of Dr. Young's

actual location when the three prescriptions in Counts II through IV were "made" and sent. The record shows that he resided in Fredericksburg, Texas, in the Western District of Texas, and nothing in the record supports an inference that he was anywhere else in February 2019.

The case law is clear: venue for a false statement lies only in the districts where the false statement was made or received. *See, e.g., United States v. Fortenberry,* 89 F.4th 702, 705-13 (9th Cir. 2023) (vacating conviction, since essential conduct of § 1001 offense is defendant's act of uttering false statement, restricting venue to defendant's physical location when statement made)[9]; *United States v. Salinas*, 373 F.3d 161, 169-70 (1st Cir. 2004) (vacating conviction for passport fraud, where statute proscribed knowingly making a false statement in passport application with intent to induce issuance of passport; essential conduct element was the submission of the application containing false statements, precluding venue in the district where State Department processed the false application); *De Rosier, supra* at 36 n.7 (venue only in district where statement made or received).

---

[9] In *Fortenberry,* the government argued that venue was proper in a district where the effects of the false statements may be felt, but the Ninth Circuit rejected this argument. *See id.* at 706-10. The court found that the government's argument would lead to "highly problematic venue outcomes" and said that the Venue and Vicinage Clauses "may not be disregarded simply because it suits the convenience of federal prosecutors." *Id*. at 709.

The essential conduct element of § 1035 is the falsification or making of a materially false statement. The other elements deal with mens rea and the "connection with the delivery" of health care benefits or payments." The Government did not introduce any evidence from which a fact-finder could determine that the "falsification" or "making"—in this case Dr. Young's transmittal of the three patient charts with prescriptions by pressing the "OK" button—took place in the Northern District of Texas. Literally nothing supports venue in the Northern District of Texas, Dallas Division, as alleged in the indictment and where Dr. Young was erroneously tried, not even by a preponderance of the evidence standard.[10]

Counts II, III and IV must be vacated, and a new trial should be ordered in the Western District of Texas.

## III.   A New Trial Should be Ordered Because the District Court Admitted Irrelevant Opinions about Others' Knowledge

This Court should find that the district court abused its discretion in allowing the government to elicit irrelevant opinions that were used to make an improper argument – *i.e.*, that because Dr. Craig and Dr. Haas believed that Sunrise Medical was engaged in fraud, Dr. Young must have known that he was engaged in fraud. Dr. Young timely raised objections to the testimony of Dr. Craig, as well as to similar

---

[10]   As the Government noted throughout the trial, Dr. Young had no contact with patients, whether they lived in Dallas or anywhere else.  Even if he had, such contact would constitute preparatory conduct, not part of an essential conduct element of the false statement offense in § 1035.

testimony by Dr. Haas regarding Sunrise Medical and the testimony of one patient's primary-care physician regarding a genetic test that Dr. Young had ordered.[11]   The Court overruled Dr. Young's objections, citing *United States v. Ruppel*, 666 F.2d 261 (5th Cir. 1982) and *United States v. Heard*, 709 F.3d 413 (5th Cir. 2013). ROA.2156-58. But neither case involved a situation like the one here, and they are inapposite.

In *Ruppel*, a witness was allowed to testify about his opinion about the defendant's state of mind after the defendant had "opened" the topic via cross-examination. 666 F.2d at 269.  That did not happen here.  In *Heard*, a witness testified on his opinion about the defendant's state of mind based on personal experience with the defendant that gave him a "unique position to observe [the defendant's] demeanor." 709 F.3d at 422. That too was not the situation here.

Significantly, neither *Ruppel* nor *Heard* addressed the key issue raised by Dr. Young, which is whether the opinions of Drs. Craig, Haas, and one patient's primary-care physician have any relevance in a case involving the state of mind and knowledge of *Dr. Young*.

The district court's explanation of its ruling when denying Dr. Young's motion for new trial is telling: "The Court allowed the testimony from Craig and Haas

---

[11]   The primary-care physician testified that when he learned about the genetic test ordered by Dr. Young, he wrote in a note "we need to report this to Medicare as fraudulent."  ROA.3601.  This doctor had no interaction with Dr. Young and had no basis to know Dr. Young's state of mind, and Dr. Young never received a copy of this note.

because the testimony addressed *their* experiences with Sunrise Medical and the warning signs of fraud *they* saw." ROA.1525 (emphasis added).

But the opinions of Haas and Craig were not relevant in a case where the key disputed issue at trial was the knowledge of *Dr. Young*, and the admission of such opinions was unduly prejudicial. In particular, the government used Dr. Craig's opinions and suspicions in both its closing and rebuttal arguments to argue that Dr. Young must have known that he was engaged in fraudulent activities. *See* ROA.4488-90 (comparing Craig, who "did the right thing," to Dr. Young, who "agree[d] to commit fraud"), ROA.4585 (arguing in rebuttal that the fraud was "obvious" because "you heard from Dr. Matthew Craig").

The government's use of Dr. Craig's testimony raises the kinds of concerns noted by Justice Gorsuch in his recent dissent in *Diaz v. United States*, 602 U.S. 526 (2024), explaining that expert opinions about what "most" drug couriers think should not have been allowed under Rule 403—even if permissible under Rule 704(b):

> Surely, in our system of justice – where we recognize that each individual is presumed innocent and distinctly endowed with free will and choice, where the individual is responsible for his culpable mental states but not those of others – testimony about what 'most' people think bears minimal value when the question at issue is what *this* individual thinks.

602 U.S. at 553 (emphasis in original).

So here. While Dr. Craig's opinions might have been relevant in a case brought against *him*, they had no relevance in *this* case. Nor did Dr. Haas's or that of one patient's primary-care physician. Allowing the government to elicit these opinions was especially problematic because *the Court precluded Dr. Young from eliciting that many other doctors who engaged in the same conduct have not been charged with or convicted of a crime*. In its Omnibus Motion in Limine (ROA.836-65), the Government asked the Court to preclude "arguments comparing the defendant to any other person not charged in the superseding indictment and whether they will be charged with a crime." ROA.853-54. Dr. Young objected, in part because he wanted to be able to show that many of the other "top 25" doctors whom the Government presented at trial have not been convicted of a crime. ROA. 1063-64. The Court overruled Dr. Young's objections and granted the Government's motion, finding that "evidence of whether different defendants were charged with a crime in connection with Young's activities is irrelevant and barred by Federal Rule of Evidence 401." ROA.1250.

In so ruling, the Court thus allowed the Government to have it both ways. When the Government made arguments that compared Dr. Young to other doctors, the Court agreed that such comparisons were relevant. But when Dr. Young tried to make arguments comparing him to other doctors, the Court agreed with the Government that such comparisons were irrelevant. The Sixth Amendment right to

present a complete defense was violated, as here, by "evidence rules that infringe upon a weighty interest of the accused and are arbitrary or disproportionate to the purposes they are designed to serve." *Holmes v. South Carolina*, 547 U.S. 319, 324 (2006) (quotation marks omitted).

Ultimately, this trial should have focused on what Dr. Young knew and believed, not what Dr. Craig or others knew and believed. Not only were the district court's rulings on this issue patently improper under FED. R. EVID. 403, as there was no proper probative value to this evidence and it was substantially outweighed by the danger of unfair prejudice. That error was compounded by precluding the defense from offering evidence that would have put this improperly-admitted evidence in fair context for the factfinder.

The district court abused its discretion in allowing the government to introduce the opinions of other doctors, which invited the jury to conclude that Dr. Young must have had knowledge because other doctors with different experiences and background did, and a new trial is warranted on this basis.

## IV.  A New Trial Should be Ordered because of Failure to Give Instruction Regarding Multiple Conspiracies

Count I of the superseding indictment alleged a conspiracy with Dr. Young, Steven Kahn, Clifford Powell, Christian Arendt, Matthew Harrington, Miranda Harrington, Michael Speer, and "other persons known and unknown."  ROA.502-

03. The government's evidence at trial was very different, showing Dr. Young's connections to some of these people but no connections among them.

Dr. Young specifically requested a jury instruction based on the Fifth Circuit's Pattern Jury Instruction 2.16, asking the court to instruct the jury that it had to determine that the conspiracy alleged in Count I of the superseding indictment existed. ROA.4430. The district court denied this request. ROA.4430-31.

In the landmark *Kotteakos v. United States*, the Supreme Court confronted the problem with conspiracy prosecutions which "ma[k]e out a case, not of a single conspiracy, but of several." 328 U.S. 750, 755 (1946). The Court reversed where the defendants had been prejudiced by jury instructions which failed to require the jury to distinguish among multiple conspiracies. *Id*. at 767-72. The Court warned of the danger of prejudice to defendants in cases where the government charges a broad conspiracy but proves only a collection of narrower ones, as the overbroad charge increases the risk that a jury will be exposed to and weigh against a defendant evidence that is actually relevant only to a separate conspiracy in which the defendant was not a participant. *Id.* at 766-67. In a prominent case involving the Varsity Blues scandal, the First Circuit recently reversed under *Kotteakos*, vacating a conspiracy conviction where the scope of the conspiracy proved at trial varied from the conspiracy that was charged in the indictment because, at best, the government

proved several separate conspiracies and not the broad conspiracy charged in the indictment. *United States v. Abdelaziz*, 68 F.4th 1, 41 (1st Cir. 2023).

The year after *Kotteakos*, the Court in *Blumenthal v. United States* distinguished between fact patterns in which members of a broader conspiracy seek to "achiev[e] a single unlawful end" and those in which the alleged coconspirators each pursue "an end in itself, separate from all others, although all [a]re alike in having similar illegal objects." 332 U.S. 539, 558 (1947). In the latter class of cases, there is no common goal shared by the alleged participants in the single broader charged conspiracy, even though each alleged participant may have a "similar illegal object[]" as the other participants. *Id*. The evidence adduced at trial here was sufficient to show that the conspirators at Sunrise, Expansion, and Momentum all shared a similar illegal object—billing Medicare based on fraudulently-generated prescriptions—but was wholly insufficient to prove that they acted with a common goal, since they had no connection and did not even know each other.

As the *Kotteakos* Court explained, the Government is not authorized "to string together, for common trial, eight or more separate and distinct crimes, conspiracies related in kind though they might be, when the only nexus among them lies in the fact that one man participated in all." 328 U.S. at 773. The Court explained that "our system does not tolerate" risking the conviction of a defendant for participating in a broad conspiracy when multiple, separate conspiracies were instead proven:

The dangers for transference of guilt from one to another across the line separating conspiracies, subconsciously or otherwise, are so great that no one really can say prejudice to substantial right has not taken place.

*Id*. at 773-74.

This Court has held that the crucial factor is whether the alleged co-conspirators all took part in a *common plan or scheme*, not just a similar illegal objective. *United States v. Elam*, 678 F.2d 1234, 1246 (5th Cir. 1982). The sister circuits agree. *See. e.g., United States v. Swafford*, 512 F.3d 833, 842 (6th Cir. 2008) (finding no "common goal" where coconspirators engaged in similar conduct but were unaware of and indifferent to one another's activities); *United States v. Rosnow,* 977 F.2d 399, 406 (8th Cir. 1992) (finding no common purpose where defendants "engaged in similar acts for similar reasons...in order to benefit themselves individually…and not to benefit the group as a whole"); *United States v. Harrison*, 942 F.2d 751, 757 (10th Cir. 1991) (distinguishing between an overarching conspiracy with a "common" goal and multiple conspiracies with "identical" –  but not common – goals).

Here, there was no overlap between or among Expansion Media, Sunrise Medical, and Momentum in terms of membership or knowledge or plan, even if they shared a "similar illegal object." Moreover, the evidence was very different between Dr. Young's conduct regarding prescriptions for braces (Sunrise and Expansion) and for genetic tests (Momentum):

- People associated with Sunrise and Expansion indicated that they did commit health care fraud, whereas Powell and Harrington, the witnesses associated with Momentum, denied committing health care fraud and only admitted violating the Anti-Kickback Statute through the method that they were paid.

- The evidence involving Sunrise and Expansion focused on supposed "red flags" that arguably went to Dr. Young's knowledge, while the allegations relating to Momentum instead focused on whether he knew or did not know that he was supposed to personally call patients before ordering genetic tests.

The diagram below summarizes the connections with Dr. Young and the lack of connections among the three groups of conspirators, as established at trial:



Ultimately, the evidence overall indicated that Dr. Young, assuming there was any evidence of knowledge to establish his guilt as a co-conspirator in the first place, could have only been a participant in one or more of three potential separate conspiracies: one with Sunrise, another with Expansion, and a third with Momentum.  This Court has "repeatedly held that 'a defendant is entitled to a multiple conspiracy instruction if he specifically and timely requests such an instruction and his theory has legal and evidentiary support.'"  *United States v. Stowell*, 947 F.2d 1251, 1258 (5th Cir. 1991).  Accordingly, the court was required to instruct about multiple conspiracies and direct the jury to determine whether the conspiracy specifically alleged in Count I even existed.  The conviction in Count I must be reversed for its refusal to do so.

## V.     The Sentence Should be Vacated because the District Court Erred in its Calculation of the Loss Amount

The sentence should be vacated and remanded because the district court erred in calculating the loss amount for which Dr. Young should be held responsible.

### A.     Standard of Review

The district court's application of the Sentencing Guidelines is reviewed *de novo*.  Findings of fact are reviewed for clear error.  And "[w]hen a defendant is sentenced under an incorrect Guidelines range—whether or not the defendant's ultimate sentence falls within the correct range—the error itself can, and most often

will, be sufficient to show a reasonable probability of a different outcome absent the error." *Molina-Martinez v. United States*, 578 U.S. 189, 198 (2016).

## B.     Intended Loss

First, the district court erred in using the amounts billed by DME companies and genetic testing labs as the amount of "pecuniary harm" that Dr. Young "purposely sought to inflict."  The note to the table in Guideline 2B1.1(b)(1) distinguishes between "actual loss" and "intended loss" based on actual knowledge (note (C)(iv)), what was reasonably foreseeable even if not actually known (note (C)(iv)), and what was purposefully intended (note (C)(ii)), but the district court failed to properly account for these.

This case differs from the typical health care fraud case where a defendant submits claims to Medicare or has some knowledge of what is billed to Medicare by receiving payments and the remittance advices that accompany such payments. Here, there was no evidence that Dr. Young was aware—or had any ability to be aware—of the amounts that were later billed Medicare for the braces and tests he prescribed.  Nor was there evidence of any amounts of "pecuniary harm" that he "purposely sought to inflict" on Medicare.  Accordingly, there was no evidentiary basis to make any findings regarding "intended loss."

Instead, the court should have made a loss determination based solely on actual loss. This is the only category of loss that considers what a defendant "reasonably should have known," even if the defendant did not have actual knowledge.

At sentencing, the district court overruled Dr. Young's objections to intended loss by citing the "Vargas" case. *See* ROA.4690. This apparently was a reference to cases in this Circuit holding that the amount of loss is the greater of actual loss or intended loss. *See, e.g., United States v. Rao*, 123 F.4th 270, 283 (5th Cir. 2024) (discussing "intended loss" in the context of *United States v. Vargas*, 74 F.4th 673 (5th Cir. 2023)). But such cases are not applicable here. Dr. Young did not dispute that the "intended loss" should have been used if it is greater than the "actual loss." He disputed the use of the amounts billed by other people, without his knowledge, as a proxy for what Dr. Young himself "purposely sought to inflict" and the district court's resultant calculation of "intended loss."

The court also appeared to confuse the significance of Medicare's fee schedules. *See* ROA.4690. Dr. Young acknowledges that the existence and availability of fee schedules are relevant to what might have been "reasonably known" by Dr. Young and thus support the use of paid amounts in terms of actual loss. But the fee schedules have no bearing on what was billed by DME companies and genetic testing labs, and they have no bearing on determining what Dr. Young himself "purposely sought to inflict."

Moreover, even if the district court was correct in using intended loss, it should not have used the amounts billed to Medicare. As this Court has held, the billed amounts are "prima facie" evidence of the amount of intended loss, but are not "conclusive," and a defendant can introduce additional evidence "to suggest that the amount billed either exaggerates or understates the billing party's intent." *United States v. Isiwele*, 653 F.3d 196, 203 (5th Cir. 2011) (internal quotations and citations omitted).

This is extremely important here, where the record was clear that Dr. Young was *not* "the billing party" and had no knowledge of what was billed by the DME companies and the labs. The billed amounts could be used to establish what the DME companies and the labs intended, but not what Dr. Young, who was multiple levels removed from the billing, intended. The court erred in ignoring this crucial distinction in determining the intended loss amount. *See United States v. Valdez*, 726 F.3d 684, 696 (5th Cir. 2013) (error to calculate intended loss without considering evidence in record that rebutted the prima facie evidence of intended loss).

## C.    The Loss Calculation Was Improper

The loss calculation, whether intended or actual, should have been based on findings about Dr. Young's knowledge and state of mind. The jury did not make a finding as to *when* it thought Dr. Young had sufficient knowledge that he was committing fraud with braces or with genetic tests, and the loss calculation was

erroneous in including all the payments based on Dr. Young's alleged orders.   The jury's verdict shows that that jurors necessarily concluded that Dr. Young knew that the DME companies were acting fraudulently by the time of the February, 2019, false statements in Counts II, III and IV, but the jury's verdict does not indicate if the jurors found that he knew before then.   The district court should have addressed Dr. Young's arguments and made a finding as to *when* he had sufficient knowledge, and it should have excluded payments before that date.

Regarding genetic tests, the evidence was disputed as to whether Dr. Young believed that he had to talk with patients to order genetic tests.  The jury's verdict does not indicate how the jury resolved this issue, if at all.  Accordingly, the district court should have made factual findings as to whether it believed Clifford Powell or Dr. Young regarding the July 23, 2018, call that Powell did not discuss in his direct examination and denied remembering when cross-examined.  If the district court did not believe Powell's testimony in this regard, then it should have discounted some if not all the genetic test payments in computing loss.  The lack of finding here had massive effect on the Guidelines calculation, as most of the loss attributed to Dr. Young was based on the genetic test payments.

The sentence should be vacated and remanded for further findings and the restitution amount based on actual loss.

## CONCLUSION

For the foregoing reasons, Dr. Young should be acquitted.  In the alternative, this Court should order that the conviction be vacated and that the case be remanded to the Western District of Texas for further proceedings, or it should order a new sentencing.

Respectfully submitted,

By: _/s/ Karen Cook_

S. MICHAEL MCCOLLOCH, PLLC
**S. Michael McColloch**
E-mail: smm@mccolloch-law.com
Phone: 214.643.6055

KAREN COOK, PLLC
**Karen L. Cook**
E-mail: karen@karencooklaw.com
Phone: 214.643.6054
6060 N. Central Expressway, Suite 500
Dallas, Texas 75206

LAW OFFICE OF STEPHEN CHAHN LEE, LLC
**Stephen Chahn Lee**
Email: SLee@StephenLeeLaw.com
Tel.: 312.436.1790
209 S. LaSalle Street, Suite 950
Chicago, IL 60604

**Attorneys for Appellant**

## CERTIFICATE OF SERVICE

I hereby certify that on June 5, 2025, an electronic copy of the foregoing document was filed with the Clerk of Court for the United States Court of Appeals for the Fifth Circuit using the appellate CM/EFC filing system and that service will be accomplished using the appellate CM/ECF system.

By: */s/ Karen Cook*
Karen Cook

## CERTIFICATE OF COMPLIANCE

This document complies with the type style requirements of 32(a)(6) and the type-volume limit of Fed. R. App. P. 32(a)(7) because, excluding the parts of the document exempted by Fed. R. App. P 32(f) this document contains 12,902 words according to the word count function in Microsoft Word Version 16.96.2, in compliance Fed. R. App. P. 32(a)(7) authorizing the filing of a brief of up to 13,000 words, prepared in a proportionally spaced typeface in Times New Roman 14 point font size.

By: */s/ Karen Cook*
Karen Cook